**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-01682-001-TUC-RM (BGM) |
| Plaintiff, | **ORDER** |
| v. | |
| Jesus Andres Islava, | |
| Defendant. | |

Pending before the Court is Defendant Jesus Andres Islava's Motion to Suppress Statements (Doc. 29), the Government's Response (Doc. 34), Defendant's Reply (Doc. 47), Magistrate Judge Bruce G. MacDonald's Report and Recommendation ("R&R") (Doc. 63), Defendant's Objection to Magistrate Judge Macdonald's R&R (Doc. 66), and the Government's Response to Defendant's Objection to Magistrate Judge Macdonald's R&R (Doc. 73).

Defendant is charged with 13 counts of making false statements in connection with the acquisition of firearms, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2), and one count of knowingly exporting firearms in violation of 18 U.S.C. § 554(a). (Doc. 8.) Defendant moves to suppress two sets of statements he made to government investigators without the benefit of *Miranda* warnings. (Doc. 29.) First, Defendant moves to suppress statements he made to agents with the Bureau of Alcohol, Firearm, Tobacco and Explosives ("ATF") on July 20, 2018, outside a residence in Amado, Arizona. (*Id.*) Second, Defendant moves to suppress statements he made to those agents during a subsequent interrogation at

the ATF office in Tucson, Arizona on July 23, 2018. (*Id.*)

After holding an evidentiary hearing, Magistrate Judge Macdonald recommended that the Court deny Defendant's Motion to Suppress Statements in its entirety. (Doc. 63.) On de novo review, the Court will deny Defendant's Motion as to the statements made at the residence on July 20, 2018, but will grant Defendant's Motion as to statements made at the ATF office on July 23, 2018.

**I.   Factual Background**

   A.   <u>Initial Encounter at Amado Property</u>

On July 20, 2018, ATF Special Agent Matthew Bayer and Agents Matthew Owen and Robert Kilcoyne were investigating Defendant in connection with suspicious firearms purchases. (Transcript of October 1, 2019 Evidentiary Hearing, Doc 52 ("Hrg. Tr. 10/1/2019") at 8:19-24.) Bayer testified that he learned via firearm purchase reports that Defendant had purchased as many as 16 guns within a five-day period, and that one of those guns was recovered two days after its purchase in Mexico. (*Id.* at 5:15-6:15.) Based on that preliminary information, Bayer wanted to confront Defendant "to determine if there was any nefarious activity going on." (*Id.* at 7:20-21.)

The three agents drove to the address in Amado, Arizona that Defendant had provided as his residence on the purchase reports. (*Id*. at 8:1-15.) Bayer testified that the agents drove together in an unmarked vehicle, and that they were wearing plain clothes and carrying firearms concealed beneath their shirts. (*Id.* at 9:3-25, 17:1-4.) The Amado property contained a dirt driveway extending from the main highway, with several trailers situated lengthwise off the dirt driveway. (*Id.* at 10:14-19.) The agents went up to the door of the trailer associated with Defendant and knocked. (*Id.* at 10:1-8.) A child answered the door and told the agents that her mother, Perla Islava, lived at the address, but that no adult was home. (*Id.* at 13:1-8.)

Moments later, Defendant arrived driving a small pickup truck. (*Id.* at 13:25-14:5.) The agents' audio recording reflects Bayer initiating conversation with Defendant by saying, "Nice to meet ya. I'm Matt Bayer with ATF . . . I wanna talk to ya a little bit about

some firearms purchases that you made recently." (Transcript of Interview with Jesus Islava, July 20, 2018 ("Int. Tr. 7/20/18") at 2:77-78.) Bayer then asked how many firearms Defendant had purchased and how many were still in his possession. (*Id.* at 3:95-107.) Defendant admitted that he had purchased "probably twelve firearms" and that he had "got them for a while and then after that I guess [] sold them." (*Id.* at 3:103-116.) Bayer later testified that "after speaking with [Defendant] for just a few minutes, I could tell that he was someone that was involved in the purchase of these firearms and trafficking of these firearms to Mexico." (Hrg. Tr. 10/1/19 at 23:6-9.)

Bayer continued questioning Defendant, eventually telling him that "…you and I need to probably have another conversation soon." (Int. Tr. 7/20/18 at 26:1136-1140.) Bayer also told Defendant to try and get the license plate number of Juan, a suspected associate, and bring it to the ATF. (*Id.* at 27:1177-79.) "That might be beneficial to ya. Okay?" he continued. (*Id.* at 27:83.) "Here's – the situation is, um you – you – you can't purchase guns and resell 'em for a profit – for $100 profit. Okay? It's – it's you need to have a license to do that . . . you've let . . . 16 guns go south into Mexico. And I think you and I both know that you know that that's happened. Right?" (*Id.* at 27:1183-28:1191.) Defendant stated that he could meet the ATF agents at the ATF office in Tucson, Arizona, on Monday, July 23, 2018, at 11:00 a.m. for a follow-up conversation. (*Id.* at 27:1164-1175.) The interrogation continued for approximately 20 more minutes, and at no point during the interrogation was Defendant read his *Miranda* rights.

B.  ATF Office Interrogation

On July 23, 2018, Defendant arrived approximately fifteen minutes early to the ATF office in Tucson. (Hrg. Tr. 10/1/19 at 37:5-6.) He was led inside a small room, which Bayer later described as approximately ten feet by ten feet or smaller. (*Id.* at 39:9.) Bayer described the room as a "conference room" which had an automatically locking door and also doubled at times as a holding cell. (*Id.* at 39:2-6.) The video of the interrogation shows that Defendant first sat in an open chair by a door but was then moved into the far corner of the room where he was directed to sit between a desk and a wall. (Video Recording of

July 23, 2018 Interrogation, Exhibit 4 to October 1, 2019 Evidentiary Hearing.) Bayer and Owen – each of whom is each significantly larger than Defendant – sat in between Defendant and the doors. (*Id.*)

Bayer began the interrogation by accusing Defendant of withholding information, telling Defendant that Bayer had "found some guns that you didn't tell me about – you know what I mean." (Int. Tr. 7/23/18 at 2:65.) Bayer continued to interrogate Defendant, asking detailed questions about his firearms purchases for approximately 20 minutes without providing *Miranda* warnings. After those approximately 20 minutes, Bayer read Defendant his *Miranda* rights. Bayer testified that he made the decision to read Defendant his rights partway through the interview because Bayer was initially focused on discovering the identities of Defendant's suspected associates. (Hrg. Tr. 10/1/19 at 44:22-25.) Because Defendant insisted that he knew only the first names of his suspected associates, Bayer realized that Defendant "was not going to be able to be utilized," which meant that the charges would "land pretty much on [Defendant]." (*Id.* at 45:1-23.)

Bayer introduced the *Miranda* warnings by telling Defendant that he had been "super cooperative" and that he would "walk out of here unless [he] committed a murder or some crazy something." (Int. Tr. 7/23/18 at 17:761-765.) "But," Bayer continued, "I do want to just let you know your rights," after which he read Defendant his rights in English. (*Id.* at 17:769-777.) Defendant responded "Mm-hm," to which Bayer replied, "Okay, cool, um I'm just gonna have you sign a- sign this here. Um, saying that you understand that. And print your name underneath. Okay and, uh, waiver – and okay you're still gonna talk to me I assume right?" (*Id.* at 18:779-783.) Defendant responded affirmatively. (*Id.* at 18:785.)

Without any break following the reading of Defendant's rights, Bayer continued to question Defendant. The questioning continued for nearly two more hours, during which the interrogators repeated numerous questions from the prewarning interrogation. In particular, Bayer again asked Defendant to confirm that it was his handwriting and signature on the firearm purchase reports which form the basis for Defendant's indictment.

The agents continued to reassure Defendant that they wished to target his associates and that Defendant would be free to go home that night. (*Id.* at 23:1025-1027.) At the end of the interrogation, Defendant was arrested. (Hrg. Tr. 10/1/19 at 48:13-15.)

## II. Motion to Suppress and Report and Recommendation

Defendant filed his Motion to Suppress Statements on July 3, 2019, arguing that both sets of statements should be suppressed as taken in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966) and its progeny. (Doc. 29). After the Motion was fully briefed, Magistrate Judge Bruce G. Macdonald held an evidentiary hearing on October 1, 2019 and November 4, 2019. (Docs. 34, 47, 50, 58.) Defendant, Defendant's neighbor, ATF Special Agent Matthew Bayer, and ATF Agent Matthew Owen testified. (Docs. 50, 58.)

Following the evidentiary hearing, Magistrate Judge Macdonald issued his R&R, which recommends that the Court deny Defendant's Motion to Suppress Statements in its entirety. (Doc. 63.) Defendant timely objected, arguing that Magistrate Judge Macdonald erred in concluding that Defendant was not in custody during the July 20, 2018 interrogation at the Amado property and that Magistrate Judge Macdonald erred in failing to fully analyze the July 23, 2018 interrogation under relevant precedent. (Doc. 66.) The Government filed a Response to Defendant's Objections, arguing that Defendant was not in custody during either interrogation. (Doc. 73.)

## III. Standard of Review

This Court "may accept, reject, or modify, in whole or in part, the finding and recommendations" made by a magistrate judge. 28 U.S.C. § 636(b)(1). The Court must "make a de novo determination of those portions" of a report and recommendation to which a party objects. *Id.*

## IV. Governing Law

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The Supreme Court of the United States has "recognized that custodial interrogations, by their very nature, generate 'compelling pressures which work to

- 5 -

undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 467). "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran*, 475 U.S. at 420. The Constitution requires that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444).

### A.  Custodial Interrogation

"An officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him "in custody."'" *Stansbury*, 511 U.S. at 322 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "Custodial" means taken into custody or otherwise deprived of freedom of action in a significant way. *Miranda*, 384 U.S. at 444. "Two discrete inquiries are essential to the ["in custody"] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The Court must "examin[e] all of the circumstances surrounding the interrogation" and "decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (quoting *Stansbury*, 511 U.S. at 322).

### B.  Midstream *Miranda* Warnings

Midstream *Miranda* warnings occur when a suspect provides an unwarned admission, interrogators then inform the suspect of his *Miranda* rights, and the suspect proceeds to waive those rights and give a second statement. When first considering the

effect of midstream *Miranda* warnings, the Supreme Court of the United States concluded that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Oregon v. Elstad*, 470 U.S. 298, 314 (1985). As such, the Court held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.*

Following the Supreme Court's ruling in *Elstad,* a deliberate law enforcement tactic of strategically delaying *Miranda* warnings spread nationwide, and the Supreme Court subsequently revisited the issue in *Missouri v. Seibert*, 542 U.S. 600 (2004). In his opinion in *Seibert*, Justice Souter explained that the strategic purpose of delaying warnings was "to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611. Justice Souter, writing for a four-Justice plurality, concluded that an exception to *Elstad* was necessary and that statements obtained by the use of midstream *Miranda* warnings must be suppressed if the circumstances "challeng[ed] the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 616–17. Justice Kennedy, whose concurring opinion provided the fifth vote for departing from *Elstad*, wrote that the exception to *Elstad* should instead be limited to situations where "the *deliberate* two-step strategy was employed." *Id.* at 621–22 (emphasis added).

Because Justice Kennedy provided the crucial fifth vote for departing from *Elstad,* the Ninth Circuit has held that his more restrictive approach effectively "narrowed" *Seibert's* holding. *Reyes v. Lewis*, 833 F.3d 1001, 1027–29 (9th Cir. 2016); *see also Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . .'") (citation omitted). Analyzing Justice Souter's

plurality opinion alongside Justice Kennedy's concurrence, the Ninth Circuit has interpreted *Seibert* as holding that "even a voluntary postwarning confession must be excluded where law enforcement officials deliberately withheld *Miranda* warnings until after obtaining an in-custody confession, and where insufficient curative measures had been taken to ensure that the suspect understood the meaning and importance of the previously withheld warnings." *Reyes*, 833 F.3d at 1027.

## V. Discussion

### A. Interrogation at Amado Property

Upon de novo review, the Court finds that *Miranda* warnings were not required during the interrogation at the Amado property on July 20, 2018, because Defendant was not in custody during that interrogation. Bayer, Owen, and Kilcoyne contacted Defendant while in plainclothes and without weapons showing. (Hrg. Tr. 10/1/19 at 9:3-14; 17:1-4.) Agent Bayer addressed Defendant in a friendly manner, saying, "Nice to meet ya, I'm Matt Bayer with ATF . . . I wanna talk to ya a little bit about some firearms purchases that you made recently. (Int Tr. 7/20/18 at 2:77-78.) The agents talked to Defendant in a familiar environment outside of a familiar residence, and did so in a friendly, non-threatening manner. Defendant was never told that he was under arrest or otherwise restrained, and the agents were not blocking Defendant's egress route.

Defendant's reliance on *United States v. Brobst*, 558 F.3d 982 (9th Cir. 2009), is misplaced. In that case, agents entered the defendant's home to execute a search warrant and demanded that the defendant meet with them. *Id.* at 995–96. Here, in contrast, agents knocked on Defendant's front door, explained that they "wan[ted] to talk" about Defendant's firearms purchases, and Defendant agreed to talk voluntarily. Defendant's citation to *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) is also inapposite, as in that case eight law enforcement officers from multiple agencies entered the defendant's home in tactical gear and interrogated the defendant in an enclosed area while blocking his ability to leave. *Id.* at 1085–86. Here, in contrast, Defendant was questioned outside by three officers, who were in plainclothes and did not brandish weapons.

Given the totality of the evidence, the Court finds that a reasonable person in Defendant's position would have felt free to leave or terminate the July 20, 2018 interrogation. Defendant was therefore not in custody, *Miranda* warnings were not required, and the Court will adopt Magistrate Judge Macdonald's recommendation that Defendant's Motion to Suppress be denied as to the statements made during the July 20, 2018 interrogation.

### B.      Interrogation at Tucson ATF Office

The Court finds that the statements made by Defendant at the ATF Office on July 23, 2018 must be suppressed because the ATF interrogators deliberately delayed providing *Miranda* warnings during a custodial interrogation, rendering the warnings ineffective when finally provided.

#### 1.      Custodial Interrogation

To determine if Defendant was in custody, the Court "examin[es] all of the circumstances surrounding the interrogation" and "decide[s] 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Kim*, 292 F.3d at 973 (quoting *Stansbury*, 511 U.S. at 322). Factors for determining custodial status include: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Kim*, 292 F.3d at 974 (citations omitted). These factors weigh in favor of a finding that Defendant was in custody.

First, Bayer used mandatory language and threats to arrange the Tucson meeting. Although Defendant drove himself to the ATF Office, he did so only after being informed by Bayer during the initial encounter that "I think you and I *need* to probably have another conversation soon." (Int. Tr. 7/20/18 at 26:1138-1139.) Bayer then implicitly threatened Defendant, telling him he should come to the ATF office in Tucson to have another conversation because, as Bayer put it, "[Y]ou can't purchase guns and then resell 'em for a profit – for $100 profit. Okay? It's – it's – you need to have a license to do that . . . you've

let . . . 16 guns go south into Mexico. And I think you and I both know that you know that's happened." (*Id.* at 26:1183-27:1191.)

Second, the interrogation began with Bayer confronting Defendant with documentary evidence of his guilt, referring to a stack of purchase reports and telling Defendant that "I found some guns that you didn't tell me about – you know what I mean." (Int. Tr. 7/23/18 at 2:65.) "[T]hat's concerning to me," Bayer continued  ". . . cause you had – you told me . . . you started [purchasing firearms] in March." (*Id.* at 2:69-73.) Bayer then listed specific firearms and dates of purchase, asking Defendant if he remembered the guns. (*Id.* at 2:79-3:105.) "These are more guns that you bought that you didn't tell me about, you know," Bayer alleged. (*Id.* at 3:105-106.)

Third, upon arriving at the ATF Office in Tucson, Defendant was held in a small, windowless room that is sometimes used as a holding cell. (Hrg. Tr. 10/1/19 at 39:2-6, 89:14-15.) The room had two doors, one of which locked automatically. (*Id.* at 87:20-21.) Upon being placed in the interrogation room, Defendant originally sat himself in an open chair adjacent to a door. (*Id.* at 89:3-10.) Almost immediately, Bayer directed Defendant to move to a seat in the far corner of the room, wedged between a desk and the wall. (*Id* at 90:7-14.) The video of the interrogation shows two agents – each much larger than Defendant – placed in between Defendant and either door. (Video Recording of July 23, 2018 Interrogation, Exhibit 4 to October 1, 2019 Evidentiary Hearing.)

Fourth, Defendant was interrogated for over two hours. The Ninth Circuit has found shorter periods of interrogation to have been custodial. *See United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (finding factor probative of custody where "*Miranda* warnings were provided after about ten to twenty minutes . . ."); *Brobst*, 558 F.3d at 996 (finding defendant was in custody although he was only questioned for "two minutes or so" and only "ten to fifteen minutes elapsed" before defendant was arrested).

Finally, the circumstances of the interrogation placed significant pressure upon Defendant to remain in the interrogation room. Although Defendant was not handcuffed, he was placed in between a desk and a wall with agents blocking either door. *See*

*United States v. Beraun-Panez*, 812 F.2d 578, 581 (9th Cir.), *modified,* 830 F.2d 127 (9th Cir. 1987) ("Although Beraun-Panez was not held or handcuffed, he was positioned between the two officers beside the hood of the truck.") Defendant was also not informed that he was free to leave. Although Bayer did tell Defendant early in the interrogation that he was not "under arrest," Bayer added ominously ". . . at this point," implying that Defendant's continued freedom was contingent on his continued participation in the interrogation. (Int. Tr. 7/23/18 at 2:72-75.) Bayer continued by later telling Defendant that "…you're going to walk out of here unless you tell me you committed a murder or some crazy something," apparently again conditioning Defendant's "walk[ing] out" of the ATF office on his continued cooperation. (*Id.* at 17:761-65.) Bayer later made this suggestion explicit, promising falsely that "…I'm gonna have you, um, just fill out a – a little form for me. And, um, *then* you can be on your way." (*Id.* at 29:1304-1305.)

Given the totality of the circumstances, the Court finds that a reasonable person in Defendant's position would not have felt free to leave during the July 23, 2018 interrogation. Even if initially voluntary, the interrogation was transformed into a custodial interrogation when Defendant was placed into a small room with no clear exit and confronted with documentary evidence of his guilt. *See Kim*, 292 F.3d at 975 ("If an individual voluntarily comes to the police station or another location and, once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial.")

2. Deliberateness

The evidence supports a finding that the ATF interrogators deliberately delayed providing *Miranda* warnings in order to weaken their effectiveness. When a law enforcement officer conducts a custodial interrogation, "there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed." *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006). "Instead, the most plausible reason for the delay is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness." *Id.* "[I]n determining whether the interrogator deliberately

1  withheld the *Miranda* warning, courts should consider whether objective evidence and any
2  available subjective evidence, such as an officer's testimony, support an inference that the
3  two-step interrogation procedure was used to undermine the *Miranda* warning." *Id.* at
4  1155–56. Objective evidence of deliberateness includes "the timing, setting and
5  completeness of the prewarning interrogation, the continuity of police personnel and the
6  overlapping content of the prewarning and postwarning statements." *Id.* at 1159.

7        As an initial matter, the Court is not persuaded by the Government's explanations
8  for the delayed warnings. The Government first argues that the interrogators decided to
9  provide warnings midway through the interrogation because they "began suspecting the
10 defendant of being dishonest with them." (Doc. 73 at 9.) From the record before the Court,
11 however, it is clear that the interrogators suspected Defendant of being dishonest with them
12 from the beginning of the initial conversation at the Amado property. During that
13 conversation, Bayer directly challenged the accuracy of Defendant's statements, and later
14 testified he did so because he "didn't believe" Defendant. (Hrg. Tr. 10/1/19 at 79:5-8.)
15 Indeed, Bayer began the ATF office interrogation by saying that "what I wanted to do, is
16 kind of go over things again . . . and have you explain to me what *really* went down." (Int.
17 Tr. 7/23/18 at 3:100-111.) It therefore does not appear that the impetus for finally providing
18 warnings during the July 23, 2018 interrogation was that agents "began suspecting"
19 Defendant of dishonesty. (Doc. 73 at 9.)

20       The Government argues secondly that warnings were not intentionally delayed as
21 Defendant "had already admitted to his offenses on July 20, 2018," at Defendant's property
22 in Amado. (*Id.*) However, a review of the prewarning interrogation at the ATF office
23 reveals that interrogators asked Defendant about additional incidents not discussed on July
24 20, 2018. (*See* Int. Tr. 7/23/18 at 2:65-67) (Bayer tells Defendant that he "found some guns
25 that you didn't tell me about – you know what I mean.") Moreover, the interrogators
26 repeatedly asked questions designed to further incriminate Defendant beyond admissions
27 made in the prior interview, for example pressing Defendant as to whether he had ever
28 crossed the border with any kind of firearm, even a personal one, for any reason. (*Id.* at

11:485-12:533.)

Finally, the Government contends that the investigation was focused on Defendant's alleged associates rather than on Defendant personally. (Doc. 73. at 9.) However, many of the incriminating questions asked of Defendant would not have implicated any associates. Moreover, even if the ultimate goal of the interrogation was merely to gather information on Defendant's alleged associates, this would not excuse the delay in providing warnings. As the Ninth Circuit has squarely held, "[t]hat the ultimate goal of the interrogation was apparently to gather information to charge [the defendant's associate] rather than [the defendant], does not sanction the agents' decision to delay *Miranda* warnings." *Barnes*, 713 F.3d at 1206. As in that case, the midstream warnings here also "necessarily elicited inculpatory information about [Defendant's] transactions with [Defendant's associates], and thus necessarily inculpated [Defendant]." *Id.*

The Court finds the Government's explanations for the delayed warnings unpersuasive. The objective *Williams* factors also weigh in favor of a finding that warnings were deliberately delayed. *Williams*, 435 F.3d at 1159.

First, the prewarning interrogation was detailed and complete. Over approximately 20 minutes of prewarned interrogation, Bayer asked Defendant about the alleged purchase of dozens of firearms, going through sales reports one-by-one in chronological order. (Int. Tr. 7/23/18 at 2:89-5:201.) Bayer confirmed with the Defendant the dates of the alleged purchases and the number and type of guns purchased. (*Id.*) He asked Defendant numerous detailed questions about financial arrangements and about suspected associates. (*Id.* at 6:232-9:365.) Bayer also handed Defendant the stack of firearm purchase reports, telling him to "[k]ind of look over" them and "try to remind yourself of what about those purchases okay." (*Id.* at 13:555-558.) Still before providing warnings, Bayer then asked, and Defendant admitted, that the purchase reports "look[ed] familiar" and that Defendant "remembered signing all of them." (*Id.*)

Second, there was a great deal of overlapping content between the prewarning and postwarning interrogation. The interrogators returned repeatedly to the prewarning lines of

questioning, repeating numerous questions after providing warnings. Perhaps most significantly, the interrogators elicited specific admissions regarding each alleged firearms transaction both prior to and after providing warnings. At the evidentiary hearing, Bayer testified that the postwarning interrogation focused on "pretty much" the "[s]ame sort of thing that [Bayer was] focused on the whole time." (Hrg. Tr. 10/1/19 at 102:2-7.)

Third, there was a continuity of police personnel before and after the warnings, and Bayer led the interrogation both prewarning and postwarning. As the Ninth Circuit has observed, the continuous presence of the lead interrogator is perhaps the "most important" issue regarding continuity of personnel. *Reyes*, 833 F.3d at 1032. As there was no change in lead interrogator, Defendant was deprived of the opportunity to "distinguish the two contexts" and "appreciate that the interrogation [had] taken a new turn," and so this factor weighs in favor of a finding of deliberateness. *Seibert*, 542 U.S. at 622.

As the Government's explanation for the delayed warnings is unpersuasive and the *Williams* factors weigh in favor of a finding of deliberateness, the Court concludes that the interrogators deliberately employed a two-step interrogation for the purpose of weakening the effectiveness of the warnings.

    3. <u>Effectiveness</u>

"When an interrogator has deliberately employed the two-step strategy, *Seibert* requires the court then to evaluate the effectiveness of the midstream *Miranda* warning to determine whether the postwarning statement is admissible." *Williams*, 435 F.3d at 1160. The Ninth Circuit has adopted six factors suggested by the *Seibert* plurality and Justice Kennedy's concurrence. *Id.* Three of these factors are also considered in the analysis of deliberateness: the overlapping content of the two rounds of interrogation, the completeness and detail of the prewarning interrogation, and the continuity of police personnel. *Id.* In addition, the Court should consider the timing and circumstances of both interrogations, the extent to which the interrogator's questions treated the second round of negotiations as continuous with the first, and whether any curative measures were taken. *Id.*

As discussed above in the analysis of deliberateness, the prewarning interrogation was detailed and complete, the two rounds of interrogation overlapped significantly, and there was a continuity of interrogators. These factors weigh in favor of a finding that the *Miranda* warnings, when finally provided, were not effective.

The timing and circumstances of the two parts of the interrogation also supports a finding of ineffectiveness. The interrogators waited to provide warnings until Defendant had made very specific admissions. Before providing the warnings, Defendant admitted that he remembered signing *each* of the purchase reports which form the basis of the indictment, including the date and the number and type of firearms purchased. Such timing impairs the effectiveness of *Miranda* warnings. *See Seibert,* 542 U.S. at 613 ("Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent.") It is clear that Defendant admitted his involvement prior to receiving warnings and that his "postwarning confession was merely an elaboration on his prewarning admission of guilt." *Barnes*, 713 F.3d at 1207.

The interrogators also treated the postwarning interrogation as a continuation of the prewarning interrogation. Following the warnings, the interrogation continued seamlessly in the same room and without any break. *See Barnes*, 713 F.3d at 1206 (finding that "[t]he agents treated the second round of interrogation as continuous with the first" as "[t]here was no break or dividing point in the interrogation" and the defendant "was interrogated in the same place before and after the warnings.") Defendant was not provided a "psychological, spatial, and temporal break between the unwarned and warned interrogations." *Reyes*, 833 F.3d at 1032. Moreover, the interrogators repeatedly referred back to admissions made by Defendant during the earlier, unwarned portion of the interrogation, for example asking, "Jesus, you said earlier, uh you went by a house that, uh, you thought Juan lived at 'cause you met him there once. Do you remember what house that was or where it was at?" (Int. Tr. 7/23/18 at 34:1487-1490.) In sum, the interrogators treated the prewarning and postwarning portions as a single continuous interrogation.

Nor did the interrogators employ measures that might have ensured that the warnings were effective even though delayed. In his concurrence in *Seibert*, Justice Kennedy wrote that "curative measures" could make delayed warnings effective if they "ensure[d] that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). He suggested as curative measures "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.* at 621-22. Here, there was neither a break in time or circumstances between the two portions of the interrogation, nor an additional warning that Defendant's prewarning admissions would likely not be admissible.

Finally, the interrogators not only declined to take curative measures, but actually made statements and representations that appear designed to obscure the meaning and importance of the warnings. In *Reyes v. Lewis*, the Ninth Circuit found that the interrogator "did quite the opposite" from employing curative measures. 833 F.3d at 1031. In that case, the interrogator "played down" the "importance" of the warnings by telling the defendant that he was warned because the interrogator wanted "just to clarify stuff." *Id.* at 1032. The court concluded that the interrogator's "stated reasons" for providing the warning "were hardly an effective means of conveying the fact that the warning he was about to give could mean the difference between serving life in prison and going home that night." *Id.* at 1032.

Similarly, Bayer here told Defendant, immediately before reading the warnings, that "You've been super super cooperative. And like I said I -y- you're gonna walk out of here unless you committed a murder . . . You'll be walking out of here. But, um, I do want to just let you know your rights . . ." (Int. Tr. 7/23/18 at 17:761-18:770.) After Defendant acknowledged his rights ("Mhmm"), Bayer conveyed the message that the warnings he just read should not change anything, "Okay and, uh, waiver – and okay you're still gonna talk to me I assume right?" (*Id.* at 18:768-783.) As in *Reyes,* these statements appear calculated to minimize and obscure "the fact that the warning . . . could mean the difference between

[going to prison] and going home that night." *Reyes*, 833 F.3d at 1032.

The Court concludes that the delayed warnings failed to effectively convey the "the import and effect of the *Miranda* warning and of the *Miranda* waiver" and were therefore ineffective. *Seibert,* 542 U.S at 622. Based on the Court's findings that the interrogators deliberately withheld *Miranda* warnings during a custodial investigation, and that the warnings were therefore ineffective when finally provided, the July 23, 2018 statements must be suppressed.

**VI. Conclusion**

The Court will partially adopt Magistrate Judge Macdonald's R&R (Doc. 63). The Court will grant Defendant's Motion to Suppress Statements (Doc. 29) as to the statements made at the Tucson ATF Office on July 23, 2018 and deny Defendant's Motion as to the statements made at the Amado residence on July 20, 2018.

Accordingly,

**IT IS ORDERED** that Magistrate Judge Macdonald's Report and Recommendation (Doc. 63) is **adopted in part**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Statements (Doc. 29) is **granted in part and denied in part**. The Motion is granted with regard to statements made by Defendant on July 23, 2018, at the Tucson ATF Office. The Motion is denied with regard to statements made by Defendant on July 20, 2018, in Amado, Arizona.

Dated this 23rd day of June, 2020.

_____
Honorable Rosemary Márquez
United States District Judge